UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------x
                                              :
PATRICIA ROSADO                               :          3:13 CV 789 (JGM)
                                              :
V.                                            :
                                              :
CAROLYN W. COLVIN,                            :
ACTING COMMISSIONER OF                        :
SOCIAL SECURITY                               :
                                              :          DATE: JUNE 25, 2014
------------------------------------------------- x

<u>RECOMMENDED RULING ON PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE
COMMISSIONER, AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE
COMMISSIONER</u>

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and

1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social

Security ["SSA"] denying plaintiff Disability Insurance Benefits ["DIB"].

## I.  ADMINISTRATIVE PROCEEDINGS

On May 4, 2009, plaintiff Patricia Rosado, applied for DIB claiming that she has been

disabled since July 31, 2007, with an amended onset date of March 1, 2009,[1] due to pain,

fibromyalgia, fatigue, shortness of breath, and panic attacks. (Certified Transcript of

Administrative Proceedings, dated July 25, 2013 ["Tr."] 150-53; <u>see also</u> Tr. 73-74, 88, 180).

Plaintiff's application was denied initially and upon reconsideration.  (Tr. 99-102, 106-08; <u>see</u>

Tr. 71-98, 154-56).   On July 16, 2010, plaintiff filed a request for a hearing before an

Administrative Law Judge ["ALJ"] (Tr. 109-10; <u>see</u> Tr. 111-20), and on August 9, 2011, a

hearing was held before ALJ Kim K. Griswold, at which plaintiff and a vocational expert

---

[1](<u>See</u> Tr. 37).  In her brief, however, plaintiff contends that her "correct onset date, as she
originally claimed, is July 31, 2007" as "[d]efendant determined that her earnings in 2007 and 2008
were not Substantial Gainful Activity" and plaintiff's "Earnings Record shows minimal earnings in
2009 and 2010[.]" (Dkt. #14, Brief at 5).

testified. (Tr. 31-70; see Tr. 121-46). Plaintiff has been represented by counsel. (See Tr. 31, 103-05, 147-49). On September 23, 2011, ALJ Griswold issued her decision finding that plaintiff has not been under a disability from March 1, 2009 through the date of her decision. (Tr. 9-25). Plaintiff filed her request for review of the hearing decision (Tr. 7-8), and on April 2, 2013, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On May 31, 2013, plaintiff filed her complaint in this pending action. (Dkt. #1).[2] On August 22, 2013, defendant filed her answer, along with a copy of the certified administrative record, dated July 25, 2013. (Dkt. #11).[3] On October 30, 2013, plaintiff filed her Motion to Reverse the Decision of the Commissioner, or in the alternative, Motion to Remand for a Rehearing, with brief in support. (Dkt. #14). On January 9, 2014, defendant filed her Motion to Affirm the Decision of the Commissioner, and brief and exhibit in support. (Dkt. #18; see Dkts. ##16-17).[4]

For the reasons stated below, plaintiff's Motion to Reverse, or in the alternative, to Remand (Dkt. #14) is denied, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #18) is granted.

## II. FACTUAL BACKGROUND

### A. ACTIVITIES OF DAILY LIVING AND HEARING TESTIMONY

Plaintiff was born in 1970 and is forty-four years old. (Tr. 176). Plaintiff completed the twelfth grade, she went to beauty school, and she is a certified nurse assistant ["CNA"].

---

[2]Plaintiff also filed a Motion to Proceed in Forma Pauperis (Dkt. #2), which motion was granted three days later. (Dkt. #7).

[3]There is some duplication in the medical records.

[4]Attached to defendant's motion is an excerpt from the DSM-IV.

(Tr. 187).  She is married and has three minor children. (Tr. 38-39).

Plaintiff testified that she cannot work because she is "so fatigued, very fatigued and very forgetful." (Tr. 38, 41).[5]  On an average day, plaintiff wakes around eight o'clock, takes about one to two hours to get out of bed, takes medicine, returns to bed, gets out of bed and lays inside or outside, "relax[es,]" has lunch, "relax[es] again[,]" tries to clean but cannot, and then cooks dinner.  (Tr. 52-53; see Tr. 241, 260; see also Tr. 41-42 (she cooks "sometimes[,]" and her children or husband clean her house)).   In her application for benefits, plaintiff reported that she gets her children up and walks her school-age children to the bus stop (Tr. 202), although at her hearing, plaintiff testified that she cannot walk to her mailbox.  (Tr. 52).  According to plaintiff, she "cannot do anything at home[,]" and she "cannot take care of certain things at home[]" without the help of her children and her husband.  (Tr. 38-39; see Tr. 241). She has "no [e]nergy."  (Tr. 242)(emphasis in original). In her application for benefits, plaintiff reported that she cooks and cleans for her family and does "a lot" for her then-seven-year old daughter, although it is "still very hard, [and she] always need[s] to stop [and] take a break."  (Tr. 202).  Plaintiff cooks "complete meals [with] several courses[,]" and it takes her more than two hours. (Tr. 204, 243; but see Tr. 41 (she cooks "sometimes")). Her husband takes care of her pet birds.  (Tr. 203, 242). Plaintiff testified that she does the laundry when she can, "[o]therwise the children help [her]." (Tr. 41).   She does not do any outside chores, but she does cleaning, laundry and ironing, although it takes her a "long time [because she has] no energy." (Tr. 205; see also Tr. 211, 244). However, she also testified that her children or husband clean her house. (Tr. 42).

─────────────────────

[5]At the outset of her hearing, plaintiff noted that she was "getting a panic attack" and she "just want[ed] to breathe a little and just relax."  (Tr. 36).

Plaintiff testified that she "used to be a good mother, a good worker, loved [her] job[,] [and] [d]id everything, [including] shopping" which she cannot do anymore.  (Tr. 39).  However, plaintiff also reported that she drives, and she does the shopping for her family.  (Tr. 205-06; see Tr. 244, 246).   Plaintiff further testified that when she was grocery shopping, she went into someone else's car because she "can't remember . . . as much anymore." (Tr. 39).[6]  She testified that when her children are not around, she will do a short grocery trip (Tr. 42), but she cannot lift things like bleach containers.  (Tr. 42-43).

According to plaintiff, she has a lot of anxiety which makes it "hard to function."  (Tr. 49).  She is "very forgetful[,]" and she repeats herself a lot.  (Id.).[7]  Her anxiety is triggered by crowds, and she is suspicious of items, like coffee or food, that her mother or former clients would give her because she is afraid that someone is trying to hurt her.  (Id.).   She testified that she avoids people, and while she used to dance with her husband, she has not done so in four or five years.  (Tr. 41).

Plaintiff testified that she has fatigue, which she has had since her 20s, but she has had more fatigue for the past ten years, such that she has to sit in front of her stove when cooking and then must lay down. (Tr. 50-51).   According to plaintiff, "[e]very activity makes [her] fatigue worse."  (Tr. 51).  It is "very, very hard" for plaintiff to climb stairs, she can only stand for three to four minutes, and her work as a CNA was "hard" because she did not have the strength to lift the patients.  (Tr. 203 (emphasis in original); see also Tr. 248).  According to plaintiff, she has "sha[r]p pain (shooting pain)" in her legs and her chest

_____

[6]While testifying about her work history, plaintiff said, "forgive me for my memory. Sometimes I might get confused."  (Tr. 47).

[7]During her interview when she applied for benefits, the interviewer noted that plaintiff "had trouble remembering some dates."  (Tr. 177).

4

"[h]urts[.]" (Tr. 203; see Tr. 210).[8]  She gets light-headed and out of breath when washing and drying her hair, and when she has a bowel movement.  (Tr. 203; see Tr. 238).

According to plaintiff, she can lift ten pounds, she gets tired when she stands, it "hurts" to squat, bend, stand, or kneel, she is out of breath when walking or climbing stairs, and she has to stop to rest after walking five minutes.  (Tr. 207-08; see also Tr. 246).  She is "very forgetful[,]" she is too weak to complete tasks, she has difficulty understanding, although she can follow written instructions "very well[,]" she has "very poor" concentration, although she handles changes in routine "fine[,]" and she gets along with authority figures. (Tr. 207-08; see also Tr. 212, 246-47).

Plaintiff takes or has taken Cymbalta (Tr. 43, 237, 243, 259, 262), Xanax or Alprazolam (Tr. 43-44, 186, 204, 211, 237, 243, 259, 262), Sertraline (Tr. 186, 204, 211), Wellbutrin or Buproprion (Tr. 186, 204, 211, 237, 243, 259), Ibuprofen (Tr. 43, 262), Tylenol (Tr. 43), vitamin D with calcium (Tr. 43, 186, 204, 211, 237, 243, 259), Repliva 21/7 (Tr. 186, 204, 211, 237), Se-Vate or Ferrex 28 (Tr. 243, 259), Feldene (Tr. 429), Ranexa (Tr. 43, 45) and Omeprazole, which plaintiff testified was for angina, but her counsel clarified that the latter is for acid reflux.  (Tr. 43, 46).

The ALJ complimented plaintiff on her appearance, in response to which plaintiff testified that it takes her a "couple of days to relax wherever [she has] to go[,]" and then she must take breaks while she is getting ready to go out.  (Tr. 39-40).

B. PLAINTIFF'S WORK HISTORY & VOCATIONAL ANALYSIS

Plaintiff last worked in July 2010 as a self employed certified nurse assistant ["CNA"]. (Tr. 46, 48; see Tr. 163-71, 189, 214, 223).   She would go to people's homes, feed them,

---

[8]As of April 2010, plaintiff reported more pain in her neck and on the left side of her lower back and in the middle of her spine.  (Tr. 256).

change them, and lift them.  (Tr. 46, 182, 191, 215; <u>see</u> Tr. 224-27).  The heaviest weight she lifted was one-hundred and fifty pounds, and she frequently lifted between thirty and fifty pounds.  (Tr. 182, 192, 216-18, 225-27; <u>but see</u> Tr. 215 & 224 (heaviest and most frequent weight listed was ten pounds)).  At the time that she applied for benefits, plaintiff reported that she was still working, but not at a level of substantial gainful activity, she had cut back on her hours, and was taking on "easier cases – only do one patient."  (Tr. 172, 175).  She also worked at Waterbury Hospital and in a convalescent home as a CNA, performing the same duties.  (Tr. 46-47, 189, 214).  As a CNA, plaintiff would also draw blood, perform EKG testing, check vital signs, and assist in patient care.  (Tr. 181, 191, 225-26; <u>see</u> Tr. 216-17).  She would walk, handle, grab or grasp, and reach for eight hours in the work day; stand, write or type for four hours; sit for one hour; and climb or stoop for less than an hour.  (<u>Id.</u>).  She reported that she had to "keep cutting back [her] hours at Waterbury Hospital until [she] finally had to quit[] [because she] was missing a lot of work[,]" and "wasn't feeling well."  (Tr. 180).  Prior to that, she worked at CVS Pharmacy for approximately six months before leaving to go to school to become a CNA.  (Tr. 47; <u>see</u> Tr. 223).  Plaintiff also worked as a nail technician, a photo lab technician, an Avon sales representative, and a clerk at the post office.  (Tr. 181, 189, 214, 219-20, 223, 228-29).

At her hearing, the vocational expert reviewed plaintiff's past work as a manicurist and as an Avon sales representative, neither of which rose to the level of substantial gainful activity (<u>see</u> Tr. 55-59), before noting plaintiff's most recent work as a nurse assistant and sales clerk.  (Tr. 59-60).  The vocational expert testified that a hypothetical individual who has no exertional limitations, is able to understand, remember and carry out simple instructions throughout an ordinary work day and work week with normal breaks on a

sustained basis, and who cannot tolerate strict rate, pace or production requirements, nor can tolerate public contact, but can respond appropriately to co-workers, accept supervision for simple tasks, adapt to minor changes in the work setting, can travel, take public transportation and can make simple work related decisions occasionally, can perform the work of a CNA. (Tr. 60-61). However, if such an individual was limited to light work and the same mental residual functional capacity, that individual could not perform the work of a CNA, but could work as a home or personal care attendant, a cleaner, housekeeper, or a mail room clerk. (Tr. 61-64). If such an individual was absent more than three times a month, however, such individual would not be able to perform any work. (Tr. 64).

Upon inquiry from plaintiff's counsel, the vocational expert testified that an individual limited to light work, as well as no public interaction, no interaction with strangers, no production quotas, or "flexible requirements to meet job related goals[,]" or an inability to carry out instructions, or be off task one hour per day, could still work as a personal care or home care attendant. (Tr. 64-68). If a sit/stand option was added, the individual could still perform the work of a personal care attendant, but there would not be such an option for a cleaner, housekeeper or a mail room clerk. (Tr. 69).

C. MEDICAL RECORDS

1. PRE-ONSET DATE OF DISABILITY RECORDS

Plaintiff claims an onset date of disability of March 1, 2009. (See Tr. 37). Plaintiff's medical records, however, begin more than three years earlier, in January 2006,[9] specifically January 5, 2006, when plaintiff was seen at Waterbury Hospital for back pain. (Tr. 338-45). On January 31, 2006, plaintiff was seen by Dr. Donna Windish of Alliance Medical Group for

---

[9]Reference to these earlier records serves to establish plaintiff's treatment history.

her generalized anxiety disorder and acute depression.  (Tr. 445-46).  She agreed to try Celexa.  (Tr. 446).  On March 31, 2006, plaintiff was seen for panic attacks and "feeling very anxious at work when she had to go to lunch or attend events with more than [two] people." (Tr. 423-25).  Dr. Windish opined that plaintiff's anxiety is "still an[ ] issue[,]" and her chest symptoms are most likely related to anxiety.  (Tr. 424).  On April 24, 2006, plaintiff was seen at Waterbury Hospital for chest pain.  (Tr. 321-37).  She complained of a history of anxiety attacks with similar complaints of chest pain in the past, but she reported that this time the chest pain and pressure lasted four to five minutes.  (Tr. 328).  She was diagnosed with anxiety.  (Tr. 329).  Later in the day, she presented to Dr. Windish with the same complaints of chest pain.  (Tr. 419-22).  Dr. Windish observed that "based on [plaintiff's] disposition and history[,] this appears to be a component of her anxiety attacks."  (Tr. 421).  On May 1, 2006, plaintiff was seen by Dr. Windish for her anxiety and chest discomfort.  (Tr. 417-18). Dr. Windish explained that it would be important for her to have a psychiatrist's opinion, and she prescribed Xanax.  (Tr.418).  She was referred for a heart monitor which she wore for thirty days, from May 1, 2006 to June 7, 2006, and it revealed that her complaints were not associated with arrhythmia.  (Tr. 413, 534; see Tr. 414, 418).  She was also referred to a psychiatrist, Dr. Robert Behrends.  (Tr. 418).  On May 15, 2006, plaintiff returned to Dr. Windish for her complaints of anxiety and chest pain.  (Tr. 415-16).  Plaintiff requested a referral to a cardiologist while she was still in the midst of using the heart event monitor. (Tr. 416).  On June 16, 2006, Dr. Windish again referred plaintiff to Dr. Behrends for her generalized anxiety disorder.  (Tr. 412).[10]  On June 26, 2006, plaintiff returned to Dr. Windish after seeing the psychiatrist.  (Tr. 408-09).  She was taking Xanax at the psychiatrist's

---

[10]On June 19, 2006, plaintiff was seen by Dr. Windish for a swollen left eyelid. (Tr. 410-11).

recommendation.  (Id.).  She was assessed as being overweight and having anxiety/depression, and chest pain, although she was "more aware now that her symptoms are probably all due to anxiety." (Tr. 409).

Plaintiff was seen by Dr. Mark Ruggerio of Cardiology Associates of Greater Waterbury, LLC on June 27, 2006.  (Tr. 531-33).  Plaintiff was referred for an echocardiogram and exercise stress test to rule out a cardiac source of her symptoms.  (Tr. 533).  Plaintiff underwent an exercise stress test on July 6, 2006, the results of which were normal.  (Tr. 528-30).

Dr. Windish saw plaintiff on August 4, 2006 as a follow up for her anxiety and palpitations.  (Tr. 406-07).  Dr. Windish noted that plaintiff had followed up with cardiology and had a normal echocardiogram and stress test.  (Tr. 406).  She reported that she only gets these symptoms when very busy at work and that it is "helped somewhat with [X]anax." (Id.).  At that time, her symptoms were improving.  (Tr. 407).  She was diagnosed with anxiety panic type, without agoraphobia.  (Id.).

On October 29, 2007, plaintiff was seen by Dr. Behrends; she was "tired[.]" (Tr. 382). Plaintiff was seen by Dr. Windish on November 5, 2007 for complaints of fatigue and shortness of breath. (Tr. 403-05).  She expressed concern that "she has something bad and will die and leave her children without a mother." (Tr. 403).  At that time, she was working as an aide at an assisted living facility.  (Tr. 404).  She was assessed as having fatigue, generalized anxiety, and chest pressure.  (Id.).

On December 7, 2007, Dr. Windish referred plaintiff for a hematology consult for "[p]ersistent lymphopenia of unclear etiology with symptoms of fatigue."  (Tr. 400; see Tr. 402 (November 14, 2007 visit)).   Three days later, plaintiff was seen by Dr. Behrands who

noted that plaintiff was dizzy, weak and tired.  (Tr. 382).

Plaintiff began treatment with Dr. Anamika Katoch of Medical Oncology and Hematology for leukopenia and her complaints of fatigue and tiredness on December 26, 2007.  (See Tr. 273).  On January 9, 2008, Dr. Katoch noted that plaintiff's blood work revealed a "very low ferritin level of 4, suggestive of iron deficiency[ ]" but no evidence of anemia.  (Tr. 271-72).  She was "very anxious."  (Tr. 271). On January 21, 2008, plaintiff was feeling calmer since her Welbutrin had been increased, but on February 28, 2008, she reported that she had a panic attack two days after her last visit.  (Tr. 382).  On March 12, 2008, Dr. Katoch noted that plaintiff's "feelings of fatigue and tiredness . . . are probably not related to her iron deficiency[,]" but it was "possible that these may be side effects of some of the medications that she is taking."  (Tr. 274; see Tr. 285).  Plaintiff was seen by Dr. Windish on March 31, 2008 for complaints of dizziness and lightheadness.  (Tr. 442-44). Plaintiff was working but said that she feels lightheaded, nausea and weakness if she works more than five hours.  (Tr. 442).  She referred plaintiff for an MRI.  (Tr. 444).  On April 4, 2008, Dr. Windish noted plaintiff's dizziness, granulocytopenia, and fatigue and referred plaintiff for lab work.  (Tr. 441).   On April 7, 2008, plaintiff complained of fatigue and shortness of breath, as well as numbness in her right hand.  (Tr. 276; see Tr. 282-84, 286, 305).  Dr. Katoch recommended a 2-D echo and chest x-ray and she opined that the right hand numbness is "suggestive of carpal tunnel syndrome."  (Tr. 276). The results of an echocardiogram and chest x-rays taken the same day were normal.  (Tr. 306-09).  Plaintiff underwent an MRI of her brain on April 16, 2008, after complaining of numbness and dizziness; the results were normal.  (Tr. 293).   On May 5, 2008, Dr. Katoch noted that plaintiff's energy levels "are much improved[]"  and plaintiff was "working more hours at her

job and overall feels well." (Tr. 277).   Plaintiff was seen by Dr. Windish on May 21, 2008 for a follow up regarding her fatigue and low vitamin D levels.  (Tr. 439-40).  Plaintiff's anxiety and mood were "good" when she saw Dr. Behrends on July 2, 2008.  (Tr. 381). Plaintiff returned to Dr. Katoch on August 6, 2008 for her iron deficiency issue. (Tr. 279-80; see Tr. 281).  Plaintiff had reported improvement in her fatigue symptoms after starting on vitamin D, but she claimed she felt tired and fatigued again and had multiple joint aches and pains.  (Tr. 279; see Tr. 438 (noting vitamin D deficiency)).  Dr. Katoch referred plaintiff back to Dr. Windish "since there are no hematological or oncological issues[.]" (Tr. 280; see Tr. 435, 437).

On September 11, 2008, plaintiff reported to Dr. Behrends that she was feeling "[v]ery good[.]" (Tr. 381).   On September 15, 2008, plaintiff was seen for a rheumatology consult by Dr. Aryeh M. Abeles of UConn Health Center.  (Tr. 294-98).  Dr. Abeles noted that plaintiff has a history of generalized anxiety disorder and depression, and she did "not have any signs or symptoms of an[ ] inflammatory disorder."  (Tr. 295, 298).  She had "chronic widespread pain[,]" for which Dr. Abeles suggested "consideration of starting antidepressant medication dosages, or antipain medications such as NSAIDs[,]" as  well as increasing the antidepressants.  (Id.).  On November 5, 2008, plaintiff returned to Dr. Windish for a follow up for her complaints of pain, fatigue and dizziness.  (Tr.493-95).  Seven days later, plaintiff reported to Dr. Behrends tiredness, racing thoughts, anxiety, and soreness, and on December 29, 2008, plaintiff reported that her anxiety was "OK[,]" and she was working one day a week.  (Tr. 381).

On January 23, 2009, plaintiff underwent an overnight polysomnography which revealed "[n]o evidence of significant sleep disordered breathing."  (Tr. 469; see also Tr.

470-73).   On February 9, 2009, plaintiff reported to Dr. Behrends that she had a "[h]orrible January" with increased anxiety, pain, panic attacks, and lightheadness.  (Tr. 380). Plaintiff was seen again by Dr. Windish on February 11, 2009.  (Tr. 434).

2. TREATMENT RECORDS FROM MARCH 2009 TO DATE

On March 5, 2009, Dr. Peter Rudzinskiy saw plaintiff for a neurology consult.  (Tr. 349-50, 358-59; see Tr. 436).   Based on her clinical presentation and complaints about numbness, tingling, and weakness in the upper and lower extremities, Dr. Rudzinskiy concluded that he "would probably proceed with electrophysiologic study EMG nerve conduction study test" to "evaluate her peripheral nerve system and muscles." (Tr. 350; see Tr. 354).   The EMG test results "did not show any abnormal findings[ ]" in the upper extremities.  (Tr. 354, 364).   The impression was as follows: "Abnormal findings on nerve conduction study test could be possibly suggestive of mild demyelinating lunar nerve neuropathy, slight worse on the right side.   Clinical correlation is suggested."  (Id.).

On March 10, 2009, Dr. Behrends noted that the sleep study results were normal, but plaintiff's principal complaints continued to be tiredness and leg pain, but she was better when she took Xanax.  (Tr. 380).  On March 31, 2009, plaintiff reported to Dr. Behrends that she had decreased worry and an increased ability to think clearly and that she was exercising three times a week on her treadmill.  (Tr. 379).   She expressed her hope to become a pediatric nurse.  (Id.).

On April 6, 2009, plaintiff returned to Dr. Rudzinskiy for a neurology consult, after which he noted that he did "not see any neurological explanation of her symptoms[.]"  (Tr. 348, 357).   Dr. Rudzinskiy noted that plaintiff had a "[r]eported history of fibromyalgia, [but] no medical records available to review[,]" so he gave her a trial of Lyrica "in attempt to

12

relieve her symptoms." (Id.).  Plaintiff underwent an MRI of her cervical spine on April 9,
2009; the results revealed mild straightening of cervical lordosism and a "[t]iny annular tear
at the posterior margin of the disc at C4-5 with no significant protrusion and there is no
evidence of spinal or foraminal stenosis[.]" (Tr. 346-47, 360-61).  An ultrasound was done
to view a "guided drainage procedure and core biopsy procedure for large left chest wall [to]
the axillary mass." (Tr. 362-63).   On April 28, 2009, plaintiff told Dr. Behrends that she
blamed her family's financial problems on her "being 'too weak' to work much." (Tr. 379).
She reported that exercise causes increased fatigue and soreness. (Id.).  Plaintiff returned
to Dr. Rudzinskiy a month later on May 5, 2009. (Tr. 351, 356).  Dr. Rudzinskiy reiterated
that he did not find a neurological explanation of her symptoms and "her diagnostic workup
did not show significant muscle/nerve/CNS problem that could explain her symptoms." (Id.).
Accordingly, he referred her back to be reevaluated at a rheumatology clinic. (Id.).

Plaintiff was seen by Dr. Behrends on May 27, 2009. (Tr. 378, 449).  She reported
palpitations in her throat area and agoraphobia. (Id.).  On June 1, 2009, plaintiff underwent
a doppler ultrasound of her left lower leg for complaints of leg pain and swelling. (Tr. 365-
66).  The results were unremarkable. (Id.).   On June 15, 2009, plaintiff reported to Dr.
Behrends that she had decreased anxiety and pain and increased functioning, although she
was still getting lightheaded and still had agoraphobia. (Tr. 378, 449).

Plaintiff returned to Dr. Windish on July 8, 2009. (Tr. 431-33).  She was working
twelve hours a week but she noted "that her energy is not there still." (Tr. 431).  Five days
later, plaintiff reported to Dr. Behrends that she was "[s]o much better" with her anxiety and
was able to do more and get tired "less fast." (Tr. 378, 449).  On August 19, 2009, x-rays
were taken of plaintiff's sacroiliac joints, which revealed "[s]clerosis along the lateral margin

of the right SI joint inferiorly and the medial margin of the left SI joint inferiorly."  (Tr. 377).[11]  On the same day, plaintiff was seen by Dr. Daniel Tobin and Dr. Susan Gamble at the Alliance Medical Group, who noted a history of anxiety, depression, panic attacks, fibromyalgia, and chronic back and leg pain.  (Tr. 427-29).  She reported morning stiffness in her legs and elbows and pain in her feet in the morning "but these symptoms dissipate in approximately [fifteen] or [twenty] minutes."  (Tr. 427).  Plaintiff "has only tried [T]ylenol for [pain] relief[,]" and she had "severe pain with palpation of SI joints" such that the doctors thought that sacroilitis should be ruled out by x-ray.  (Tr. 428).  She was prescribed Feldene.  (Tr. 428-29).

When she was seen by Dr. Behrends on September 1, 2009, she reported "feeling ok[.]" (Tr. 378, 449).   The next day, plaintiff reported to Dr. Windish that she was only working five to ten hours a week due to her fatigue, lack of energy, and aches and pains.  (Tr. 387–88, 401).  She reported bruises on her right thigh.  (Tr. 387, 401; see Tr. 426).  Upon examination she appeared "well and to be in no acute distress."  (Tr. 388).   Plaintiff was seen by Dr. Windish in late September and early October 2009 for bruising on her thigh, for which she underwent some blood work.  (Tr. 397-99).[12]

On February 28, 2010, plaintiff reported to Dr. Behrends that her primary care doctor told her there was nothing wrong with her medically, but that she had no energy and she felt like passing out.  (Tr. 452).  Three weeks later, on March 18, 2010, she felt better and was "less stressed [and] less depressed."  (Id.).

---

[11]Plaintiff underwent blood work on August 6, 2007, January 9, March 5 & 12, April 7, May 5 and August 8, 2008, July 11, September 21, and October 12, 2009, April 21, 2010, and January 6, 2011. (Tr. 287-92, 367-72, 389-96, 489, 546-49).

[12]See note 11 supra.

On March 25, 2010, Dr. Windish noted that plaintiff had only one of the eighteen fibromyalgia tender points.  (Tr. 459, 491; <u>see</u> Tr. 458-60, 490-92).  Plaintiff was encouraged to seek a counselor to help her work out any "psychosocial components to her health."  (Tr. 460, 492).  On April 26, 2010, plaintiff was working ten hours a week, but complained of constant fatigue, exhaustion and weakness throughout the day, as well as leg heaviness and joint pain of all joints.  (Tr. 455-57, 486-88).  Dr. Windish noted a "question of fibromyalgia, now with worsening point tenderness of mid-thoracic spine."  (Tr. 456, 487).  Her anxiety and depression did "not appear to be well controlled."  (Tr. 457, 488).  On May 6, 2010, imaging was taken of plaintiff's thoracic spine which revealed "[v]ery minimal S-shaped scoliosis[.]" (Tr. 461; <u>see</u> Tr. 485 (referral)).

On August 4, 2010, plaintiff was seen by Dr. Rahim Shamsi, who noted plaintiff "mentioned that she has a social phobia, does not trust people, and is suffering from fibromyalgia." (Tr. 496-98).  Dr. Shamsi noted that at the time of the interview, plaintiff had mild to moderate anxiety and at times was elated.  (Tr. 496).  Dr. Shamsi opined that plaintiff "has a thought disorder[,]" and "is in need of ongoing psychiatric treatment at this time, which she agreed to." (Tr. 497).  Dr. Shamsi diagnosed plaintiff with social phobia and paranoid delusional syndrome, dependent personality, and fibromyalgia, and assigned her a GAF score of 42.  (<u>Id</u>.).  Dr. Shamsi then saw plaintiff every two weeks from August until December 2010, during which time plaintiff reported feeling anxious, depressed, and unhappy, and she experienced occasional panic attacks for which she was treated with Xanax.  (Tr. 499-501).

As of June 14, 2010, plaintiff was doing physical therapy for her back and was feeling good, "but occasionally gets pain in her [right] back to right leg afterwards" and still had

"discomfort in her upper mid-back."  (Tr. 481).  The pain was "tolerable[,]" and she was

bothered most by her fatigue.  (Id.).  Dr. Windish noted "chronic fatigue syndrome, [with a]

question of fibromyalgia, still with significant fatigue limiting her functioning."  (Tr. 482).

On July 12, 2010, Dr. Windish noted that plaintiff "decided to quit her job [because]

she is too drained and fatigued to work, even mopping the floor took her [eight] hours."  (Tr.

478).  Dr. Windish again assessed plaintiff as having chronic fatigue syndrome, with a

"question of fibromyalgia, still with significant debilitating fatigue limiting her functioning."

(Tr. 479).  Dr. Windish noted that plaintiff has "symptoms of significant depression and

anxiety which are not being adequately treated and are likely worsening her other

symptoms."  (Id.).   She recommended Tylenol for her pain and a trial of Elavil. (Id.).

Plaintiff returned to Dr. Windish on September 22, 2010 for a "follow up with

fibromyalgia[;]" Dr. Windish noted that plaintiff was seeing a new psychiatrist who was

working with her to accept "that she has fibromyalgia[.]" (Tr. 474; see Tr. 474-76).   Plaintiff

reported that it takes all day to clean one room of her house, and she tried to go to the gym

once but felt so fatigued for the next two weeks, and she has "extreme fatigue after having

bowel movements." (Tr. 474).  She "had her first panic attack in a while a few weeks ago

and took another [X]anax with good relief."  (Id.).  Plaintiff did not take Elavil as prescribed

but "tried the [T]ylenol which seemed to help a little bit[,]" and she did not increase her

vitamin D as Dr. Windish advised.  (Tr. 474; see Tr. 475, 477).  Dr. Windish noted plaintiff's

"uplifted spirits."  (Tr. 475).  At her appointment with Dr. Windish on December 29, 2010,

plaintiff continued to complain of fatigue and reported that she could not do things like

vacuuming because she was too tired, although she "does laundry, cooking and shopping

by herself without problems noting that she does not want her husband to shop or cook."

(Tr. 542; see Tr. 542-45).  Plaintiff reported that sometimes she had one of her children shop with her to help lift bags, and that she brought her cane with her when walking to help her feel safer.  (Tr. 542).  She reported that she did not like to climb stairs because her heart raced and she could become lightheaded.  (Id.).  Dr. Windish noted that plaintiff "does not meet criteria for fibromyalgia but does have persistent fatigue."  (Tr. 544).  Upon examination, plaintiff had a "completely normal musculoskeletal exam with no localizing neurological signs."  (Id.).

Plaintiff was seen by Dr. Shamsi on January 17, 2011; she was "mildly anxious, mildly depressed and on one occasion tearful."  (Tr. 538).  On March 30, 20111, plaintiff returned to Dr. Windish for neck, back and "now hip pain along with continued fatigue and vitamin deficiency."  (Tr. 539-41).  Dr. Windish recommended a physical therapy consult.  (Tr. 540).

Dr. Shamsi saw plaintiff again on April 4 and May 17, 2011 during which visits she appeared "mildly anxious."  (Tr. 537).  Dr. Shamsi "instructed [plaintiff] how to expose herself to anxiety generating situations and do more in order to avoid disabling herself." (Id.).

On April 20, 2011, plaintiff was given a twenty-four hour holter monitor, from which "[n]o significant arrhythmias[ ]" were detected.  (Tr. 524-27).  On May 3 and 27, 2011, plaintiff was seen by Dr. Ruggerio for chest pain, shortness of breath and lightheadedness that has been "going on for years."  (Tr. 509-11, 516-19).   It was noted that plaintiff "has chronic pain syndrome.  She was initially diagnosed with fibromyalgia, but now they state this is just a chronic pain syndrome."  (Tr. 509, 516).  Plaintiff underwent a stress test which "demonstrated inferior wall ischemia."  (Id.; see Tr. 514-15, 520-23). Plaintiff was referred for a cardiac catherization.  (Tr. 511; see Tr. 512-13). On June 1, 2011, plaintiff underwent

a chest X-ray for chest pain, the results of which were normal (Tr. 508), and on June 6, 2011, plaintiff underwent a cardiac catherization which revealed normal coronaries, and normal LV systolic function.  (Tr. 560-61).   Plaintiff returned to Dr. Ruggerio on June 17, 2011. (Tr. 556-59).  He "question[ed] if this is second[a]ry to small vessel disease[,]" and also noted "it may be non-cardiac altogether."  (Tr. 558). He gave plaintiff a trial of Ranexa. (Id.).

On June 20, 2011, plaintiff underwent a consultation for with Dr. Arlen I. Licheter at RehabHealth for plaintiff's long-term fatigue and generalized pain.  (Tr. 550-52).   Dr. Licheter's impression was chronic fatigue, and lumbar sprain/pain, and he noted that plaintiff does not meet the criteria for fibromyalgia.  (Tr. 552).  Plaintiff returned after new x-rays were taken; plaintiff received two injections of DepoMedrol in her back.  (Tr. 554; see Tr. 553-55).

### D. MEDICAL OPINIONS

On August 5, 2009, plaintiff was seen by Wendy A. Underhill, PhD, on behalf of Connecticut Disability Determination Services.  (Tr. 374-76).  Plaintiff reported to Dr. Underhill that she was diagnosed with fibromyalgia approximately nine years earlier, and that she was weak and tired, had dizzy spells, was forgetful, and had a history of panic attacks. (Tr. 374).  She reported difficulty working in her last job as a CNA because, in her words, "I'm  tired[,]" and she "reported difficulty maneuvering her patient in bed." (Tr. 375).  She reported that she was able to do household chores, and she drove and shopped independently, although her son "occasionally helps her lift items."  (Id.).  Dr. Underhill opined that plaintiff's symptoms suggest a diagnosis of generalized anxiety disorder with panic attacks.  (Tr. 376).  Plaintiff appeared "capable of understanding, remembering, and

carrying out simple job instructions[,] . . . would have difficulty handling ordinary job stress due to her continuous state of heightened anxiety[,]" and she "appears to relate appropriately with coworkers and supervisors." (Id.).

On August 21, 2009, Kelly Rogers, PhD, completed a Psychiatric Review Technique of plaintiff for SSA in which she assessed plaintiff for Listing 12.06 Anxiety-Related Disorders. (Tr. 92-95). Dr. Rogers concluded that plaintiff had mild restriction of activities of daily living, moderate difficulties maintaining social functioning, concentration, persistence or pace, and no episodes of decompensation. (Tr. 93). Additionally, plaintiff was moderately limited in her ability to maintain concentration and attention for extended periods, to work in coordination with or in proximity to others without being distracted by them, to complete a normal work day or work week without interruptions from psychologically based symptoms and to perform at a consistent pace, to interact appropriately with the general public, and to travel in unfamiliar places or use public transportation. (Tr. 94). Dr. Rogers noted that plaintiff's "[a]nxiety symptoms create rumination and panic that detract from sustained focus[,]" and this was "exacerbated in group work environments." (Id.). Plaintiff's apprehension slowed her work pace and "diminishes frustration tolerance." (Id.). She opined that "[w]hile severe, these symptoms do not preclude repetitive exercise of work operations of three elements or more for periods of at least two hours" over a normal work day/work week, "so long as there are limited and/or familiar persons in her work environment and she is not held to strict production quotas." (Id.). Because plaintiff was of "grossly average intellect, she can readily self-monitor and self correct." (Id.). She had an anxious affect and her panic episodes reduced her ability to interact with the general public. (Tr. 95). She was "[l]argely friendly and cooperative," and she could be "expected

to have good interaction with coworkers and supervisors[,] so long as she was not subjected to a large number of unfamiliar persons or required to interact on a frequent basis."  (Id.).  According to Dr. Rogers, "[n]ovel environments make [plaintiff] uneasy" such that her travel may be limited, and she "has the ability to accommodate minor changes in work routines and work locations."  (Id.).

On January 13, 2010, Dr. Windish completed a Psychiatric Questionnaire on behalf of plaintiff for Connecticut Disability Determination Services.  (Tr. 386).  Dr. Windish noted that plaintiff had "signs and symptoms of depression, generalized anxiety disorder, fatigue and fibromyalgia[,]" and that she was under the care of a psychiatrist for treatment.  (Id.).

On June 1, 2010, Jerrold Goodman, PhD completed a Psychiatric Review Technique of plaintiff for SSA in which he also assessed plaintiff for Listing 12.06 Anxiety-Related Disorders, and reached conclusions identical to those of Dr. Rogers and in which his explanations were verbatim to the explanations given by Dr. Rogers.  (Tr. 81-84).

Twenty-seven days later, Dr. Robert Behrends completed a Mental Impairment Questionnaire for plaintiff in which he noted her diagnoses as depression and panic disorder, fibromyalgia, restless leg syndrome, and premenstrual dysphoric disorder, and he assigned her a GAF of 55.  (Tr. 462; see Tr. 462-68, 563).  According to Dr. Behrends, plaintiff was "highly anxious, fearful and avoidant[,]" "at times [she has] poor energy [and a] sense of weakness."  (Tr. 462).  She had decreased energy, thoughts of suicide, feelings of guilt or worthlessness, generalized persistent anxiety, somatization unexplained by organic disturbance, apprehensive expectation, vigilance and scanning, sleep disturbance, recurrent severe panic attacks, and a history of multiple physical symptoms.  (Tr. 463).  According to Dr. Behrends, plaintiff was "[s]eriously limited" in her ability to understand, remember and

20

carry out detailed instructions, set realistic goals or make plans independently of others, and interact appropriately with the general public.  (Tr. 465).  She was "[l]imited but satisfactory" in her ability to deal with stress, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation.  (Id.).  Dr. Behrends noted that plaintiff's symptoms of anxiety, fear, fatigue, and weakness impair her work capacity, and she experiences chronic fatigue and low energy.  (Id.).   Plaintiff has marked restrictions in her activities of daily living; she has moderate difficulties in maintaining  social functioning, and difficulties in maintaining concentration, persistence or pace, and has had no episodes of decompensation.  (Tr. 466; see also Tr. 467-68).  According to Dr. Behrends, plaintiff would be absent about four days a month.  (Tr. 563).

On January 19, 2011, Dr. Shamsi completed a Mental Impairment Questionnaire on behalf of plaintiff in which he opined that plaintiff had social anxiety, major affective disorder and depression, dependent personality, and fibromyalgia, and he assigned her a GAF score of 40.  (Tr. 502).   He identified her symptoms as anhedonia, decreased energy, feelings of guilt or worthlessness, mood disturbance, difficulty thinking or concentrating, emotional withdrawal or isolation, short term memory impairment, easy distractibility, and involvement in activities that have a high probability of painful consequences which are not recognized.  (Tr. 503). According to Dr. Shamsi, plaintiff had moderate restriction of activities of daily living, and marked difficulties in maintaining social functioning, concentration, persistence or pace.  (Tr. 506).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal

principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008), quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see also 42 U.S.C. § 405(g).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable

physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment. See 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, she will have to show that she cannot perform her former work. See 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant shows that she cannot perform her former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

## IV.  DISCUSSION

Following the five step evaluation process, ALJ Griswold found that plaintiff has not

engaged in substantial gainful activity since March 1, 2009, the amended onset date of her disability. (Tr. 14-15, citing 20 C.F.R. § 404.1571 et seq.). ALJ Griswold then concluded that plaintiff has the following severe impairments: major depression, anxiety disorder, and dependent personality disorder (Tr. 15-17, citing 20 C.F.R. § 404.1520(c)), but her impairment or combination of impairments do not meet or equal an impairment listed in Appendix 1, Subpart P of 20 C.F.R. Part 404. (Tr. 17-19, citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). In addition, at step four, ALJ Griswold found that after consideration of the entire record, plaintiff has the RFC to perform the full range of work at all exertional levels but with the following limitations: plaintiff can understand, remember and carry out simple instructions throughout a normal work day and work week with normal breaks on a sustained basis; she cannot tolerate strict rate pace or production requirements; she cannot tolerate public contact, but can respond appropriately to coworkers; she can accept supervision for simple tasks and can adapt to minor changes in the ordinary work setting; she can make simple work-related decisions on an occasional basis; and she can travel and use public transportation. (Tr. 19-23). The ALJ also held that plaintiff is unable to perform her past relevant work as a nurse assistant and sales clerk (Tr. 23, citing 20 C.F.R. § 404.1565), but the ALJ concluded there are jobs that exist in significant numbers in the national economy that the plaintiff can perform, such as the job of a cleaner/housekeeper, mail room clerk, or home or personal care attendant. (Tr. 24-25, citing 20 C.F.R. §§ 404.1569, 404.1569(a)). According to the ALJ, plaintiff has not been under a disability from March 1, 2009 through the date of her decision. (Tr. 25, citing 20 C.F.R. § 404.1520(g)).

Plaintiff moves for an order reversing the decision of the Commissioner on grounds that the ALJ committed a number of factual errors, misstatements, distortions, and

mischaracterizations of the evidence (Dkt. #14, Brief at 12-20); plaintiff's impairments meet

Listing 12.04[13] and 12.06[14] (id. at 20-22); the ALJ failed to follow the treating physician rule

(id. at 22-36); and the ALJ failed to properly determine plaintiff's RFC (id. at 36-38).

In response, defendant contends that substantial evidence supports the ALJ's RFC

determination (Dkt. #18, Brief at 5-10); plaintiff's arguments regarding the ALJ's alleged

factual errors and mischaracterizations provide no valid basis for remand (id. at 11-19);

plaintiff failed to establish that her impairments meet or equal any listed impairment (id. at

19-21); the ALJ's determination as to plaintiff's credibility is supported by substantial

---

[13]Listing 12.04 is characterized by "a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  This Listing is met when both A and B are satisfied, or when the requirements in C are satisfied.  To satisfy Part A, there must be "[m]edically documented persistence, either continuous or intermittent, of one of the following": Depressive syndrome characterized by at least four of the following: anhedonia or pervasive loss of interest in almost all activities; or appetite disturbance with change in weight; or sleep disturbance; or psychomotor agitation or retardation; or decreased energy; or feelings of guilt or worthlessness; or difficulty concentrating or thinking; or thoughts of suicide; or hallucinations, delusions, or paranoid thinking; or manic syndrome, with at least three of the listed criteria; or bipolar syndrome as described in the Listing.

To satisfy Part B, there must be at least two of the following: marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  Part C is not relevant here.

[14]Listing 12.06 is met when the requirements of both Parts A and B are satisfied, or the requirements of both Parts A and C are satisfied.  To satisfy Part A, there must be "[m]edically documented findings of at least one of the following": generalized persistent anxiety accompanied by three out of four of the following signed or symptoms: motor tension; or autonomic hyperactivity; or apprehensive expectation; or vigilance and scanning; or a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object activity, or situation; or recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or recurrent obsessions or compulsions which are a source of marked distress; or recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress.

To satisfy Part B, there must be at least two of the following: marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  To satisfy Part C, there must be a "complete inability to function independently outside that area of one's home."

evidence and is legally correct (id. at 22-24); the ALJ's decision comports with the treating source rule (id. at 24-35); and the ALJ's Step Five finding is supported by substantial evidence.  (Id. at 35-36).

### A. TREATING SOURCES' OPINIONS

"The SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." Burgess, 537 F.3d at 128, quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(internal quotations & alteration omitted).  Generally, "the opinion of claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess, 537 F.3d at 128, quoting 20 C.F.R. § 404.1527(c)(2)(formerly § 404.1527(d)(2))(when the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, . . . [the ALJ] will give it controlling weight.")(additional citations omitted); see also Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted).   Under the treating physician rule, an ALJ assigns weight to the treating source's opinion after considering:

> (i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(per curiam), citing 20 C.F.R. § 404.1527(c)(2)(formerly § 404.1527(d)(2)).  "After considering the above factors, the ALJ

must 'comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion.'" Burgess,  537 F.3d at 129, quoting Halloran , 362 F.3d at 33; see 20 C.F.R. § 404.1527(c)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion"(emphasis added)).   "[T]he ALJ cannot arbitrarily substitute [her] own judgment for competent medical opinion."  Rosa, 168 F.3d at 79 (citation & internal quotations omitted).

In her decision, the ALJ concluded that plaintiff has the RFC to perform:

a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can understand, remember and carry out simple instructions throughout a normal workday and workweek with normal breaks on a sustained basis.  She cannot tolerate strict rate, pace or production requirements. She cannot tolerate public contact, but she can respond appropriately to coworkers. She can accept supervision for simple tasks. She can adapt to minor changes in the ordinary work setting. She can travel and take public transportation.  She can make simple work-related decisions on an occasional basis.

(Tr. 19).

In this case, the ALJ found the opinions of Dr. Behrends and Dr. Shamsi to be "unpersuasive." (Tr. 21-22).  Contrary to plaintiff's contention that the ALJ does "not say what weight she gives to [these] opinions" other than to say they are "unpersuasive[,]" the ALJ's decision details precise reasons why the ALJ did not rely on these two treating source opinions. (See id.).

In her decision, the ALJ observed that Dr. Behrend's conclusion that plaintiff has a marked restriction of activities of daily living is "inconsistent with the claimant's reported activities[.]" (Tr. 21). The underlying record supports this observation.  Plaintiff reported that on a typical day, she cooks dinner, which involves cooking "complete meals [with] several courses." (Tr.  202, 204, 241, 243; but see Tr. 41-42 (she cooks "sometimes")).  In her application for benefits, plaintiff reported that she gets her children up and walks her school-

27

age children to the bus stop (Tr. 202), although at her hearing, plaintiff testified that she cannot walk to her mailbox.  (Tr. 52). She also testified that she "cannot do anything at home[,]" and she "cannot take care of certain things at home[]" without the help of her children and her husband  (Tr. 38-39; see Tr. 241), while also reporting that she does the laundry when she can, and that she does cleaning, laundry and ironing, although it takes her a "long time [because she has] no energy." (Tr. 41, 205; see also Tr. 211, 244).   Plaintiff also reported that she drives, and she does the shopping for her family.  (Tr. 205-06; see Tr. 244, 246; see also Tr. 42-43 (when her children are not around, she will do a short grocery trip, but she cannot lift things like bleach containers)).  Additionally, plaintiff reported to Dr. Windish in December 2010 that while she is too tired to do things like vacuuming, she "does laundry, cooking and shopping by herself without problems noting that she does not want her husband to shop or cook." (Tr. 542).[15] Similarly, as the ALJ accurately noted in her

---

[15]Plaintiff contends that the ALJ "overstates [plaintiff's] abilities, because she actually needs substantial help performing" activities such as washing laundry, cooking and shopping, and this "error is significant because it allows the ALJ to conclude that [plaintiff] is 'not credible.'"  (Dkt. #14, Brief at 16-17). "The ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence . . . ."  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  When assessing a claimant's credibility, an ALJ is required to consider (1) medical signs and laboratory findings; (2) the diagnoses, prognoses, and medical opinions provided by the medical sources; and (3) statements and reports from the individual and from treating or examining physicians and psychologists and others about the claimant's medical history, treatment and response, prior work record, efforts to work, daily activities, and other information concerning the claimant's symptoms and how they affect the claimant's ability to work.  Social Security Ruling ["SSR"] 96-7p, 1996 WL 374186 at *5 (S.S.A. July 2, 1996).  "After weighing any existing inconsistencies between the plaintiff's testimony of . . . limitations and the medical evidence, the ALJ may discount the plaintiff's subjective testimony with respect to the degree of impairment."  Romano v. Apfel, No. 99 CIV. 2689 LMM, 2001 WL 199412, at *6 (S.D.N.Y. Feb. 28, 2001)(citations omitted).  As discussed above, the bulk of treatment records, along with plaintiff's reported activities of daily living, are consistent with the ALJ's RFC determination.  The ALJ's error in failing to mention the qualifiers that plaintiff noted, however, is harmless in light of the evidence in support of the ALJ's ultimate determination.  See Jones v. Astrue, No. 10 CV 476(CFD), 2011 WL 322821, at *8 (D. Conn. Jan. 28, 2011)("[O]ne instance of expansively interpreting the plaintiff's responses does not significantly detract from the ALJ's overall credibility analysis[ ]" given that the ALJ "properly cited numerous inconsistencies casting doubt on the plaintiff's credibility.").  Accordingly, this Court defers to the ALJ's credibility assessment.

decision, Dr. Underhill "stated that the claimant was able to perform household chores. She also stated that the claimant was able to drive and shop independently, and manage finances." (Tr. 21)(internal citations omitted).[16]

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, the opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issues opinions that are not consistent with other substantial evidence in the record[,]" which evidence includes plaintiff's treating physicians' medical records. Halloran, 362 F.3d at 32 (internal citation omitted). Moreover, the ALJ did not err in not deferring to Dr. Behrends' opinion when such opinion conflicted with plaintiff's own testimony and her report of the broad range of activities of daily living she is able to undertake on a regular basis. See Roma v. Astrue, 468 F. App'x 16, 19 (2d Cir. 2012)(ALJ "not required to defer" to treating physician opinion that claimant is unable to work, in light of other evidence such as the claimant's ability to "perform a reasonably broad range of light, non-stressful activities . . . , including driving, reading, sending email, and independently performing the activities of daily living while his wife worked full-time.")

In her decision, the ALJ notes that Dr. Behrends "provided no explanation" for his findings and "[s]uch an omission is noteworthy, as Dr. Behrends' findings are inconsistent with other significant evidence of record." (Tr. 21). Similarly, the ALJ is correct in that Dr. Behrends "described signs and symptoms in his assessment, including suicidal ideation,

---

[16]Although plaintiff reported to Dr. Underhill that she "leave[s] her house a mess until [she has] the strength to do it[,]" and that she forgets where she parks when she is driving, and forgets where she is going, Dr. Underhill noted that plaintiff "drove herself to her appointment and arrived on time[,]" and she concluded, despite plaintiff's self-report, that plaintiff "is able to do household chores[,]" and she is "able to drive and shop independently[.]" (Tr. 374-75).

vigilance and scanning, and recurrent severe panic attacks" that are not described in his treatment notes.[17] (Tr. 22). Rather, his treatment notes beginning March 2009,[18] reflect that plaintiff's principal complaints continued to be tiredness and leg pain, but that she improved with Xanax. (Tr. 380; see Tr. 21 (ALJ appropriately observes "noted improvement with treatment[]" which "support[s] the finding that the claimant's impairments have not resulted in work-related limitations that would preclude an ability to engage in substantial gainful activity.")). On March 31, 2009, plaintiff reported to Dr. Behrends that she had decreased worry and an increased ability to think clearly and she was exercising three times a week on her treadmill. (Tr. 379). In late May 2009, she reported palpitations in her throat and agoraphobia (Tr. 378, 449), but two weeks later, she reported to Dr. Behrends that she had decreased anxiety and pain, and increased functioning, although she would still get lightheaded and had agoraphobia. (Id.). In mid-July, Dr. Behrends noted that plaintiff was "so much better" with her anxiety and she was able to do more and get tired "less fast." (Id.). When she saw Dr. Behrends in September 2009, she was "feeling ok[,]" (id.), and she did not return to him again until late February 2010. (Tr. 452). On February 18, 2010, plaintiff told Dr. Behrends that her primary care doctor told her there is nothing wrong with her medically, even though she had no energy and feels like passing out, but one month later, she felt better and was "less stressed [and] less depressed." (Id.).

---

[17]The ALJ notes that Dr. Behrends and Dr. Shamsi "merely checked or circled boxes for [their] findings . . . but provided no explanation for such findings" which findings are "inconsistent with other significant evidence of record." (Tr. 21-22). Plaintiff contends that the ALJ erred in "giv[ing] no weight to the opinions of Dr. Behrends and Dr. Shamsi because they 'merely checked or circled boxes . . . but provided no explanation[,]'" when in fact, the doctors provided their office notes and records. (Dkt. #14, Brief at 28-29). An explanation and support for such findings would be found in the treating sources' treatment notes, but as discussed below, are not.

[18]Plaintiff was first referred to Dr. Behrends by Dr. Windish in the summer of 2006, but the relevant records at issue are from plaintiff's amended onset date of disability of March 1, 2009 forward. (See Tr. 412, 418).

Accordingly, the ALJ's conclusion that the record reflects "noted improvement with treatment[]" which "support[s] the finding that the claimant's impairments have not resulted in work-related limitations that would preclude an ability to engage in substantial gainful activity[,]" is supported by Dr. Behrends underlying treatment notes.  (Tr. 21).[19]  Moreover, the ALJ properly did not give controlling weight to Dr. Behrends' opinion expressed in the check-off form because his opinion was not supported by his own treatment notes, and it was inconsistent with plaintiff's own testimony and report as to the activities she can perform. Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009)(ALJ did not err in failing to give controlling weight to the treating physician's opinion of "extreme impairment" in "check-off form" when such opinion "is not corroborated by the contemporaneous treatment records[ .]"); see O'Grady v. Astrue, No. 10 CV 1704 (MRK)(WIG), 2012 WL 3727220, at *16 (D. Conn. Jan. 9, 2012); see also Mack v. Astrue, No. 09 CV 2122(JBA), 2011 WL 1215075, at *2 (D. Conn. Mar. 27, 2011)(ALJ could properly determine that the treating physician's opinion was not entitled to controlling weight when treatment notes "are actually inconsistent with and undermine his ultimate opinion[.]") .

Similarly, in his decision, the ALJ accurately noted that in treatment notes covering August 2010 to May 2011, Dr. Shamsi "consistently described the claimant as only mildly anxious and mildly/slightly depressed." (Tr. 20). Dr. Shamsi's contemporaneous treatment notes reflect just that -- plaintiff consistently appeared "mildly anxious" and mildly or slightly depressed.  (See, e.g., Tr. 496, 499, 537-38). Additionally, as the ALJ noted "other treating

---

[19]In support of her argument that medical records from Dr. Behrends show anxiety, increased anxiety, and a panic attack, "none of which is evidence of 'decreased anxiety with treatment[,]'" plaintiff relies on Dr. Behrends' records from February 2009 (Tr. 380), July through December 2008 (Tr. 381), and February 2008 (Tr. 382), all of which predate plaintiff's amended onset date of disability of March 1, 2009.  (Dkt. #14, Brief at 17-18).

and examining sources described the claimant as having normal/appropriate mood and affect." (Tr. 20). Plaintiff also contends that the "ALJ believes that [plaintiff] has no memory impairment[,]" but in doing so, disregards Dr. Shamsi's later opinion, issued "after seeing [plaintiff] nine times," in which Dr. Shamsi concluded that she does have a short term memory impairment. (Dkt. #14, Brief at 18). Once again, while in the January 2011 Mental Impairment Questionnaire, Dr. Shamsi checks-off a box indicating that plaintiff has a short term memory impairment, his treatment notes reflect that plaintiff's "present and past memory in regard to the events in her life did not seem to be impaired." (Compare Tr. 497 with Tr. 503). Moreover, in the January 2011 form, Dr. Shamsi declined to complete portions relating to plaintiff's ability to remember work-like procedures, noting that he is "not a vocational therapist[.]" (Tr. 504). Thus, he provided no evidence of plaintiff's memory abilities as they relate to a workplace setting.

The ALJ also appropriately notes that Dr. Shamsi included in his assessment of plaintiff, the diagnosis of fibromyalgia, and the inclusion of fibromyalgia "further undermines his opinion[ ]" as "[m]ultiple treating and examining sources specifically found" that plaintiff did not meet the criteria for fibromyalgia. (Tr. 22). Plaintiff contends that the ALJ erred in relying on Dr. Shamsi's Axis III diagnosis of fibromyalgia. (Dkt. #14, Brief at 30-31). Plaintiff is correct that Dr. Shamsi did not diagnose plaintiff with fibromyalgia (id. at 31); however, he noted under her previous history that she "is suffering from fibromyalgia[,]" (Tr. 497), and the contemporaneous treatment notes from Dr. Windish reveal that at that same time, plaintiff was seeing a new psychiatrist, namely, Dr. Shamsi, who was working with her to accept "that she has fibromyalgia[.]" (Tr. 474). The ALJ did not err in considering Dr. Shamsi's treatment records and the doctor's own considerations of plaintiff's impairments.

Additionally, the ALJ did not err in relying on the opinion of Dr. Underhill who considered

plaintiff's symptoms, which she concluded suggest a diagnosis of generalized anxiety disorder with panic attacks. (Tr. 376). Plaintiff contends that the ALJ selectively relied on, or "cherry-picked" portions of Dr. Underhill's opinion to the exclusion of other portions that favor a finding of disability, namely, that Dr. Underhill "said that [plaintiff] would be unable to work because 'She would likely have difficulty handling ordinary job stress due to her continued state of anxiety[.]'" (Dkt. #14, Brief at 26-28). However, Dr. Underhill did not state that "[plainitff] would be unable to work[,]" nor did she say that this limitation would preclude plaintiff from all work. Rather, Dr. Underhill concluded that plaintiff: "appears capable of understanding, remembering, and carrying out simple job instructions. She would likely have difficulty handling ordinary job stress due to her continuous state of heightened anxiety. She appears to relate appropriately with coworkers and supervisors. . . ." (Tr. 376). Dr. Underhill's limitations are accounted for in the ALJ's RFC assessment in that she concludes that plaintiff can respond appropriately to coworkers and respond to supervision for simple tasks, and, in light of her limitations in dealing with ordinary job stress, the ALJ concluded, as did Drs. Rogers and Goodman, that plaintiff cannot tolerate strict rate, pace or production requirements, and can adapt to only minor changes in the ordinary work setting. (Tr. 19, 94-95, 83-84). It is within the ALJ's province to discount the opinion of the treating physicians and to "permit the opinions of the nonexamining sources to override treating sources' opinions" when they are "supported by evidence in the record." Diaz v. Shalala, 59 F.3d 307, 313, n.5 (2d Cir. 1995), citing Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993); see also Micheli v. Astrue, 501 F. App'x 26, 29 (2d Cir. 2012)(after considering the opinion of the non-examining state agency physician in conjunction with the medical findings and the inconsistency of the treating source's assessments, the Second Circuit concluded that the "ALJ properly discounted [the treating source's] opinion and the ALJ's determination is

supported by substantial evidence.").

### B. OTHER ARGUMENTS

#### 1. FACTUAL ERRORS & MISSTATEMENTS

In her brief, plaintiff asserts eleven areas of error, or misstatements, made by the ALJ in her decision. (Dkt. #14, Brief at 14-20). First, the ALJ did not err in her citations to the record. (See id. at 14). The ALJ's decision is replete with citations to the exhibits that she considered along with the specific pieces of evidence upon which she relied. Second, plaintiff contends that the ALJ erred at Step Two of the analysis in concluding that plaintiff has severe mental impairments but no physical impairments. (Id. at 15-16). "At step two, if the ALJ finds an impairment is severe, the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence."   Jones-Reid v. Astrue, 934 F. Supp. 2d 381, 402 (D. Conn. 2012)(citation & internal quotations omitted), aff'd, 515 F. App'x 32 (2d Cir. 2013).   In this case, the ALJ did find that plaintiff's major depression, anxiety disorder, and dependent personality disorder were severe impairments, and then continued with the remaining steps of the analysis, in which she noted her physical impairments. (Tr. 15-25). "[T]he ALJ's failure to make determinations on whether each and every one of [p]laintiff's claimed impairments was severe is harmless error, and would not support a reversal of the Commissioner's decision." Jones-Reid, 934 F. Supp. 2d at 402.

Third, contrary to plaintiff's assertion that the ALJ erred in concluding that plaintiff does not have cardiac disease (see Tr. 44), the medical record reveals that after wearing a twenty-four hour holter monitor in April 20, 2011, "[n]o significant arrhythmias[ ]" were detected (Tr. 524-27), and while an exercise stress test "demonstrated inferior wall ischemia[,]" which led to a referral for plaintiff to undergo a cardiac catherization, the catherization revealed normal coronaries, and normal LV systolic function. (Tr. 509, 560-61). There is no definitive

diagnosis of a cardiac impairment, but rather, Dr. Ruggerio "question[ed] if this is second[a]ry to small vessel disease[,]" and also noted "it may be non-cardiac altogether." (Tr. 558).  Moreover, even focusing on the abnormal exercise stress test results, as plaintiff's does, the "mere diagnosis" of inferior wall ischemia,"'says nothing about the severity of the condition.'"[20] Burrows, 2007 WL 708627, at *6, quoting Higgs v. Bowen, 880 F.2d 860, 863 (6th Cir. 1988).[21]

### 2. LISTINGS 12.04 AND 12.06

In light of the conclusion reached in Section IV.A. supra, plaintiff's assertion that her impairments satisfy Listing 12.04 and 12.06 are moot.  (See Dkt. #14, Brief at 20-22).

### 3. STEP FIVE ANALYSIS

As discussed above, substantial evidence supports the weight the ALJ assigned to the opinions of Drs. Rogers and Goodman.    Both Dr. Rogers and Dr. Goodman concluded that plaintiff has a mild restriction of activities of daily living, moderate difficulties maintaining social functioning, concentration, persistence or pace, and no episodes of decompensation (Tr. 83, 94), and that plaintiff is moderately limited in her ability to maintain concentration and attention for extended periods, to work in coordination with or in proximity to others without being distracted by them, to complete a normal work day or work week without interruptions from psychologically based symptoms and to perform at a consistent pace, to interact appropriately with the general public, and to travel in unfamiliar places or use public

---

[20]Moreover, the severity regulation requires the claimant to show that she has an "impairment or combination of impairments which significantly limits [her] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c);  see Bowen, 482 U.S. at 146. Plaintiff does not satisfy her burden of establishing that her alleged cardiac impairment significantly limits her ability to do basic work activities.

[21]Plaintiff's remaining assignments of error have been addressed above as they relate to the ALJ's treatment of the treating physician opinions and records, and the treatment of Dr. Underhill's opinion.  (See Dkt. #14, Brief at 17-20).

transportation.  (Id.).  Moreover, according to these doctors, "[n]ovel environments make [plaintiff] uneasy" such that her travel may be limited, and she "has the ability to accommodate minor changes in work routines and work locations."  (Tr. 84, 95).  At the hearing, the ALJ presented a hypothetical to the vocational expert of an individual who has no exertional limitations, is able to understand, remember and carry out simple instructions throughout an ordinary work day and work week with normal breaks on a sustained basis, and who cannot tolerate strict rate, pace or production requirements, nor can tolerate public contact, but can respond appropriately to co-workers, accept supervision for simple tasks, adapt to minor changes in the work setting, can travel, take public transportation and can make simple work related decisions occasionally.  (Tr. 60-61).  In response, the vocational expert testified that such a person could perform the work of a CNA.  (Tr. 61).  In her RFC assessment, the ALJ found that plaintiff can understand, remember and carry out simple instructions throughout a normal work day and work week with normal breaks on a sustained basis; she cannot tolerate strict rate pace or production requirements; she cannot tolerate public contact, but can respond appropriately to coworkers; she can accept supervision for simple tasks and can adapt to minor changes in the ordinary work setting; she can make simple work-related decisions on an occasional basis; and she can travel and use public transportation.  (Tr. 19-23).  Plaintiff contends that "[a]lthough the ALJ gave controlling weight to [Dr. Rogers' and Goodman's] limitations, she did not include any of them in her description of" plaintiff's RFC.  (Dkt. #14, Brief at 36).  Specifically, plaintiff contends that the ALJ erred in concluding that plaintiff can "respond appropriately to coworkers" (Tr. 19); she can "travel and use public transportation" (id.); and that plaintiff can work throughout a normal work day and work week "with normal breaks[.]" (Id.).  Plaintiff contends that the hypotheticals posed by the ALJ did not match plaintiff's actual RFC.  (Dkt. #14, Brief at 37).

As discussed above, in addition to assigning weight to Dr. Goodman's and Dr. Rogers' opinions, the ALJ also assigned weight to Dr. Underhill's opinion.  Dr. Underhill concluded that plaintiff appears "capable of understanding, remembering, and carrying out simple job instructions[,] . . . would have difficulty handling ordinary job stress due to her continuous state of heightened anxiety[,]" and that she "appears to relate appropriately with coworkers and supervisors."  (Tr. 376).  The "ALJ [may] properly decline[ ] to include in [her] hypothetical question symptoms and limitations that [she] had reasonably rejected." Priel v. Astrue, 453 F. App'x 84, 87-88 (2d Cir. 2011)(citation omitted).  In this case, the ALJ's hypothetical question to the vocational expert accurately reflects plaintiff's vocational profile and the ALJ's RFC determination, which determination is supported by substantial evidence.

V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion to Reverse (Dkt. #14) is denied; defendant's Motion to Affirm (Dkt. #18) is granted.

The parties are free to seek a district judge's review of this recommended ruling.  See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 25th day of June, 2014.

 /s/ Joan G. Margolis USMJ
Joan Glazer Margolis
United States Magistrate Judge

37